## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTONIO CANTAMAGLIA and EMILIO OLIVA, individually and on behalf of all others similarly situated, )<br><br>Plaintiffs, )<br><br>v. )<br><br>DRAFTKINGS, INC. )<br><br>and )<br><br>FANDUEL, INC., )<br>Defendants. ) | No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Antonio Cantamaglia and Emilio Oliva (hereinafter "Plaintiffs"), by and through their attorneys, bring this action against Defendants DraftKings, Inc. and FanDuel, Inc. on behalf of themselves and all others similarly situated, and allege the following based on information and belief, except as to allegations specifically pertaining to Plaintiffs, which are made upon personal knowledge.

## NATURE OF THE CASE

1.     This is a consumer class action lawsuit brought pursuant to Rule 23 of the Federal Rules of Civil Procedure against Defendant DraftKings, Inc. ("DraftKings") and Defendant FanDuel, Inc. ("FanDuel") (collectively "Defendants") related to their operation of bogus and rigged Daily Fantasy Sports ("DFS") websites.

2.     DFS is a non-regulated industry where consumers compete against one another in fantasy sports games on a daily basis.  These competitions are held in the form of head-to-head

match-ups, single week point-earning competitions, and other formats where consumers accumulate points based on real-life statistics of players and teams in sporting events on a given day or week.

3.      Consumers can choose to play for free, but many consumers pay money to participate in Defendants' DFS competitions. The amounts paid in by consumers as entry fees to play DFS and the stakes paid out vary and are often high, with payouts that can amount to upwards of a million dollars.

4.      Defendants make money on the fees they take from competition entrants, and the more participants or entrants that enter into Defendants' competitions, the more money Defendants make.

5.      Defendants have taken great strides and gone to great lengths to attract additional customers and increase entry fees and profit, including undertaking expensive advertising campaigns beginning with the 2015 National Football League ("NFL") season. Reports indicate that Defendants have become two of the top television advertisers in the United States and have added millions of new consumer participants as a result of their advertising campaigns.

6.      To the ordinary and unwitting consumer, Defendants' DFS competitions present as a unique opportunity to "hit the jackpot" based upon more than just pure luck.  That is, Defendants advertised that entrants paying any amount as a deposit – whether small or large amounts - have the opportunity to win on Defendants' DFS sites provided that entrant can outmatch his or her opponent's skill and knowledge level in the given sport.

7.      In reality, Defendants' DFS competitions are nefariously rigged.  In what is nothing less than blatant fraud and akin to the insider trading of the pay-to-play DFS industry, both Defendants allow their employees, personnel, and even executives to routinely access inside

information to compete against consumers who lack the same inside information in order to give those employees a significant advantage in earning winnings.

8.     Specifically, DraftKings knowingly and routinely allows FanDuel personnel, employees, and even executives to use inside information to compete against DraftKings' "real" consumers. FanDuel allows and encourages this fraud: its employees can profit significantly more by using the inside information they gain at FanDuel through their employment to defraud DraftKings' customers than they can earn from their "official" FanDuel salaries.  DraftKings employees do the same exact thing on FanDuel's website.

9.     News of these practices by Defendants broke in early October 2015, when a New York Times article revealed that an employee of Defendant DraftKings admitted to inadvertently releasing inside data ahead of week 3 of the 2015 NFL football season.  That same employee won $350,000 on FanDuel in the same week.[1]

10.    As alleged in more detail herein, DraftKings allowed its employees to use material, non-public, valuable data and information to gain an enormous edge over paying consumers on FanDuel's website, including Plaintiff Oliva, and, in turn, knowingly allowed FanDuel's employees to compete against paying DraftKing competitors, including Plaintiff Cantamaglia, using material, non-public, valuable data and information, all of which Defendants failed to disclose to consumers.

11.    As alleged in more detail herein, FanDuel allowed its employees to use material, non-public, valuable data and information to gain an enormous edge over paying consumers on DraftKings' website, including Plaintiff Cantamagalia, and, in turn, knowingly allowed

---

[1] http://www.nytimes.com/2015/10/06/sports/fanduel-draftkings-fantasy-employees-bet-rivals.html?_r=0 (last visited Nov. 6, 2015).

DraftKings' employees to compete against paying FanDuel competitors, including Plaintiff Oliva, using material, non-public, valuable data and information, all of which Defendants failed to disclose to consumers.

12.     Defendants failed to disclose the fact that their employees had access to confidential, internal data which was being used to win large amounts of money on other DFS sites.

13.     Although Defendants communicated to consumers that their employees were not allowed to play on their *own* sites, Defendants omitted the material fact that they were allowed to play on competitor companies' sites.

14.     Plaintiffs and members of the Classes were unaware of these material omissions at the time they made deposits of money onto Defendants' websites for participation in rigged DFS competitions.

15.     Defendants made material representations to consumers about the fairness of their DFS competitions, when in fact these representations were made with knowledge of their falsity.

16.     Had Plaintiffs and members of the Classes known that the DFS competitions were and are rigged, they would not have made deposits of money for participation in the rigged DFS competitions.

17.     As a direct and proximate result of these fraudulent practices and omissions, Plaintiffs and members of the Classes were induced into depositing money onto Defendants' websites for participation in rigged DFS competitions, which deposits of money ultimately went into the pockets of Defendants and their employees.

18.     As a direct and proximate result of these fraudulent practices and omissions, Plaintiffs and members of the Classes have suffered harm.

4

## THE PARTIES

19.     Plaintiff Antonio Cantamaglia ("Plaintiff") is citizen of the Commonwealth of Pennsylvania, residing in Philadelphia, Philadelphia County.  On or about September 15, 2015, Plaintiff deposited five dollars ($5) into DraftKings' DFS website account in order to participate in DFS competition of supposed "skill."  When Plaintiff deposited money with DraftKings for participation in its DFS competitions, Plaintiff understood and believed that DraftKings' competitions were fair and not rigged.  As a result of DraftKings' conduct in fraudulently and/or unfairly allowing FanDuel personnel to rig DraftKings' DFS contests, Plaintiff lost money and suffered harm.  Plaintiff would not have paid to compete in DraftKings' DFS contests or competitions had he known that Defendants were allowing each other's personnel to rig their respective DFS competitions.

20.     Plaintiff Emilio Oliva ("Plaintiff") is citizen of the Commonwealth of Pennsylvania.  On or about September 13 and September 14, 2015, Plaintiff deposited twenty five dollars ($25) and fifty dollars ($50) into FanDuel's DFS website account in order to participate in DFS competition of supposed "skill."  When Plaintiff deposited money with FanDuel for participation in its DFS competitions, Plaintiff understood and believed that FanDuel's competitions were fair and not rigged.   As a result of FanDuel's conduct in fraudulently and/or unfairly allowing DraftKings personnel to rig FanDuel's DFS contests, Plaintiff lost money and suffered harm.  Plaintiff would not have paid to compete in FanDuel's DFS contests or competitions had he known that Defendants were allowing each other's personnel to rig their respective DFS competitions.

21.     Defendant DraftKings is a Delaware corporation with its principal place of business located at 225 Franklin St., 26th Floor, Boston, Massachusetts.

22.     Defendant FanDuel is a Delaware corporation with its principal place of business located at 41 East 11th Street, 10th Floor, New York, New York.

**JURISDICTION AND VENUE**

23.     This Court has jurisdiction over this matter under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Classes exceeds five million dollars ($5,000,000) exclusive of interest and costs, the Classes consist of 100 or more members, and at least one member of the putative Classes is a citizen of a state different from that of one of the Defendants.

24.     This Court has personal jurisdiction over Defendants because they are authorized to do business and are conducting business throughout the United States, including in this District; they have specifically marketed, offered, and provided their product or services in the United States, including in this District; and they have sufficient minimum contacts with the various states of the United States, including in this District, and/or sufficiently avail themselves of the markets of the various states of the United States, including in this District, through their promotion, sales, and marketing within the United States, including in this District, to render the exercise of jurisdiction by this Court permissible.

25.     Venue is proper in this District under 28 U.S.C. §1391 because Defendants, as corporations, are deemed to reside in any judicial district in which it is subject to personal jurisdiction.

26.     Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to this claim occurred in this District; Defendants regularly conduct and transact business in this District and are therefore subject to personal jurisdiction in this District; and Defendants have consented to venue in this District.

27.     Venue is also proper because Defendants are authorized to conduct business in this District and have intentionally availed themselves of the laws and markets within this District through the promotion, marketing, and conducting business in this District.

## FACTUAL ALLEGATIONS

**A.**     **Daily Fantasy Sports**

28.     DraftKings and FanDuel operate DFS websites in an unregulated industry in which consumers compete against one another in fantasy sports games or competitions.

29.     On DFS websites, consumers can pay to play[2] daily or weekly tournaments in a variety of formats, *e.g.* pool play, head-to-head.  The competitions are set up in a way that consumers draft fantasy teams composed of real athletes in a given sport, then lock-in or set their roster before the real-life competition begins. Consumers' rosters then earn points for real-life team and individual athlete performances (tied to statistics).

30.     Pictures of example DraftKings and FanDuel draft boards, where consumers select their fantasy roster for a given competition, are depicted below:

---

[2] Some competitions, however, entail free participation or competition.





31.    Once consumers lock-in their teams and the real-life athletic events commence, consumers cannot change their rosters, but can, and often do, track the performance of their fantasy team roster as the actual athletics event is occurring.

32.    DFS customers play against each other by choosing their line-up of players at certain positions for different sports. The entry fees for competition can range from as low as less than a dollar to thousands of dollars. For example, in the pictures above, the DraftKings competition - NFL $6M Millionaire Maker - had an entry fee of $20 with a maximum of 343,500 participants, while the FanDuel competition depicted - $1.2M Sun NFL Monster - has a $200 entry fee and a maximum of 6665 entrants.

33.     In these competitions, the player(s) whose fantasy team(s) scores the most points win the most money.  In a head-to-head format, the consumer who has a roster that tallies more points than their single opponent wins the pot of prize money.  In larger formats, often entailing thousands of consumers competing for, in some cases, millions of dollars, hundreds to even thousands of entrants can win cash prizes that are paid out on a tiered scale with the highest point-getters receiving the most in cash winnings.  A sample payout schedule for winnings in a large format competition – MLB $115K Moonshot [$115,000 Guaranteed] - is depicted below:



34.     As the real-life athletic or sporting events are playing out, DFS websites assign values, *i.e.* provide points, to individual athletes based on computer algorithms and the athletes' performances.   In this way, DFS is somewhat similar to standard, free-to-play fantasy sports formats such as those available on yahoo.com and espn.com.   Each DFS website customer's fantasy team performance is based on the cumulative value the DFS websites assign to the individual players on the fantasy team.

35.     As stated above, Defendants are able to operate their websites legally[3] because they market DFS as a game of skill, like chess or the stock market, and are therefore not considered gambling.

36.     Defendants make money on the fees they take from competition entrants, and the more participants or entrants that enter into Defendants' competitions, the more money Defendants make. While the prize pools of these contests are funded from entry fees, DraftKings, for example, often guarantees prize pools, and will pay out the difference between the guarantee and the entry fees.

37.     The difference between the entry fees in the prize pool and the guarantee is called the "overlay" and gives Defendants additional incentive to attract as many users and entries as possible into contests to avoid having to pay out this overlay.

38.     In the United States, the DFS industry is saturated by Defendant DraftKings and Defendant FandDuel. As of September 2015, both companies had an estimated value of at least US$1 billion, and controlled upwards of 95% of the DFS market in the United States.

39.     Both companies have become known for the aggressive marketing of their services.

---

[3] Some states, however, have outlawed residents from participating in DFS competitions.

40.     Indeed, Defendants have taken great strides and gone to great lengths to attract additional customers and increase entry fees and overall profit.  At the beginning of the 2015 NFL season, Defendants began dueling television advertising campaigns reportedly costing in excess of $100,000,000 and entailing heavy exposure on ESPN.   Reports indicate that Defendants have become two of the top television advertisers in the United States.

41.     Defendants' advertising efforts have been successful, with Defendants having added millions of new consumer participants.[4]

42.     DraftKings has increasingly attracted new users by advertising guaranteed prize pools, in which an individual consumer is guaranteed to win a large amount of money.  But when DraftKings does not make enough money from entries to fund the guaranteed prize pools, it has to pay the difference from its own coffers. This makes it extremely important for DraftKings to attract as many paying customers as possible.

43.     As such, new consumers are the lifeblood for Defendants.  DraftKings, for example, refers to its new users as "fish" and relies on these inexperienced and unskilled consumers to keep its most active users – and therefore profitable entry fee generators – on the site.[5]

44.     Both DraftKings and FanDuel have grown rapidly, with DraftKings having reported $304 million in entry fees and $40 million in revenue for 2014, compared to $3 million

---

[4] http://blogs.wsj.com/cmo/2015/09/16/are-draftkings-and-fanduel-bombarding-fans-with-too-many-ads/ (last visited Nov. 6, 2015).
[5] *Id*.

in revenue the previous year.[6] In 2014, FanDuel reported $621.7 million in entry fees, of which it took $57.3 million in revenue from its customers—a four-fold increase over 2013.[7]

**B.      Representations that DFS Competitions are Games of "Skill"**

45.     Defendants hold themselves and their websites out to Plaintiffs and members of the Classes as a place where skill makes a difference between winning and losing.

46.     In one television commercial that ran in August 2015, DraftKings advertised "every week, use your knowledge and showcase your skills . . . you like football, you like winning."[8] In another commercial in August 2015, DraftKings advertised its website as "a game within the game, that requires a different set of skills . . . we don't just play, we are players, we train, and we win."[9]

47.     Similarly, FanDuel advertised that players could "get paid for [their] knowledge" if they were "smarter than the average fan."[10] FanDuel's chief executive Nigel Eccles even boasted "We don't make any apologies that it's a game of skill, and you might go up against the best in the industry . . . .   Some of the people are really good."[11]

**C.      Insider Information and its Value**

48.     In reality, most of the money on DFS sites goes to a few individuals at the top. An analysis of publicly available data by Sports Business Daily found that in the first half of the

---

[6] http://www.betaboston.com/news/2015/01/22/draftkings-releases-some-impressive-financialnumbers/ (last visited Nov. 6, 2015).

[7] http://www.bizjournals.com/newyork/blog/techflash/2015/01/fanduel-triples-revenue-draws-1-million-users-in.html (last visited Nov. 6, 2015).

[8] https://www.youtube.com/watch?v=VDa-cDu8KYg (last visited Nov. 6, 2015).

[9] https://www.youtube.com/watch?v=bfCm6PJuL5I (last visited Nov. 6, 2015).

[10] http://www.ispot.tv/ad/AVPC/fanduelcom-one-week-fantasy-football-get-paid-for-knowledge (last visited Nov. 6, 2015).

[11] http://www.bloomberg.com/news/articles/2015-09-10/you-aren-t-good-enough-to-win-money-playing-daily-fantasy-football (last visited Nov. 6, 2015).

2015 Major League Baseball season, 91% of profits were won by just 1.3% of players.[12]

Bloomberg reported a similar distribution heavily weighted towards the top 1% of players.[13]

49.     The biggest advantage any entrant in DFS competitions can have is possessing data and information that other players do not have. Defendants' personnel have access to multiple kinds of data and information that is not accessible to the public, which they allow their personnel, and each other's personnel, to exploit for financial gain.

50.     Furthermore, and more importantly, Defendants' personnel at all times had information regarding line-ups of customers participating in every contest.

51.     Inside data regarding line-ups is invaluable inside information. It is very difficult for a competitor to win a DFS contests unless he or she selects players that are not selected by many other competitors.[14]

52.      Thus a consumer with statistical data about player ownership/selection percentages of competitors has a significant advantage over consumer without this data. Because many of DraftKings' customers are also FanDuel customers, and because the two pools of users have access to the same public information, FanDuel's personnel can predict with reasonable certainty which players will be popular on DraftKings. In other words, FanDuel personnel can

---

[12] http://www.sportsbusinessdaily.com/Journal/Issues/2015/07/27/Opinion/From-the-Field-of-Fantasy-Sports.aspx (last visited Nov. 6, 2015).

[13] http://www.bloomberg.com/news/articles/2015-09-10/you-aren-t-good-enough-to-win-money-playing-daily-fantasy-football (last visited Nov. 6, 2015).

[14] If a consumer selects only players that have been selected by other consumers, he or she has only a vanishingly small chance of winning because the consumer has the same team as many other competitors. *See* http://www.slate.com/articles/sports/sports_nut/2015/03/ncaa_bracket_picks_2015_why_you_should_bet_against_kentucky_and_pick_arizona.html  (explaining the principle of selecting players or teams that other people do not select) (last visited Nov. 6, 2015)

select low-owned/selected players who have the potential to do well but are not often selected. This offers insiders a very significant advantage over regular consumers.

53.     Insiders have many other significant advantages over regular consumers. For example, both Defendants set player pricing through certain proprietary models. Data from these models provides insiders with details about the value of certain players that other contestants do not have.

54.     Additionally, FanDuel insiders can replicate the rosters from the most consistent winners on FanDuel's website to compete with that same information on DraftKings, and vice versa. Insiders from one Defendant also can identify weak contestants or entrants on the other Defendant's website and seek those entrants out on competitor site competitions to exploit those entrants' weaknesses or lack of knowledge and make off with easy money in head-to-head matchups.

55.     DraftKings performs analytics to determine winning strategies, return on investment of certain strategies, and even how lineups on FanDuel would do if they were entered into DraftKings contests. DraftKings and its CEO Jason Robins know the value of this data and knows that it should not be shared:

> "The reason that I don't want to give the actual numbers is because I believe it creates a slippery slope where people start requesting stats on win rates of various strategies, which I believe is not a positive thing… That said, I really don't think site owners should be sharing stats on winning vs. non-winning strategies. Part of what makes this a skill game is that people who are skilled at it can figure out for themselves how to win consistently. And on that note, I do also want to point out that skilled stacking is absolutely a winning a strategy on DK. There are plenty of people who stack and win very consistently."[15]

---

[15] https://rotogrinders.com/threads/dk-stacking-tonight-8230-129959?page=5 (last visited Nov. 6, 2015).

56.     Robins went on to point out: "A lot of mixed teams that are winning on other sites would fade the stacks on DK and win if they were just entered. But they are not being entered. Take a look at some other site winning lineups and add it up for DK, you'll see it happening."[16]

**D.      Insiders Capitalized at the Expense of Honest and Unwitting Competitors**

57.     With the benefit of inside information, FanDuel employees, personnel, and executives have been able to obtain substantial profits from DraftKings users such as Plaintiff Cantamaglia, just like DraftKings insiders reaped substantial profits from FanDuel users like Plaintiff Oliva.

58.     For example, one employee of DraftKings admitted to inadvertently releasing inside data ahead of week 3 of the 2015 NFL football season.  On September 27, 2015, Ethan Haskell, a DraftKings employee, accidentally posted information about how many people selected specific NFL players for their teams in the DraftKings game that week and then stated that he was "the only person with this data."[17]

59.     That same employee won $350,000 on FanDuel in the same week, beating 229,883 entrants to win second place in a large competition.[18] DraftKings and FanDuel, in concert, outrageously and incredibly said that this employee beating 229,883 people the same week it was clear he had access to ownership data was a "coincidence."[19]

---

[16] https://rotogrinders.com/threads/dk-stacking-tonight-8230-129959?page=7 (last visited Nov. 6, 2015).

[17] http://www.slate.com/articles/sports/sports_nut/2015/10/the_insider_trading_scandals_could_bring_down_draftkings_and_fanduel.html (last visited Nov. 6, 2015).

[18] http://www.nytimes.com/2015/10/06/sports/fanduel-draftkings-fantasy-employees-bet-rivals.html?_r=0 (last visited Nov. 6, 2015).

[19] http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasysports-but-didnt-expect-uproar/ (last visited Nov. 6, 2015)

60.    Furthermore, and according to Legal Sports Report, "the amount of cross-site play by operator employees is substantial."[20]

61.    One anonymous insider has stated that "a significant number of the whales at the top DFS sites are employees—often executives—of other sites."[21] A whale is a player who bets a large amount of money and/or plays in high volumes.

62.    Shockingly, even FanDuel's CEO admitted to personally playing on competitors' sites.[22]

63.    Employees at DraftKings and FanDuel are highly successful on each other's websites.  Many reports have surfaced about personnel from one site winning big on its competitor's site.

64.    One recent report indicates that a DraftKings employee recently won a $50,000 prize on FanDuel,[23] and another report indicates that a FanDuel employee won $50,000 on DraftKings.[24]

65.    FanDuel's employees' use of DraftKings website and vice versa was and has been widespread. According to an investigation by ESPN, for example, DraftKings employees have won at least $6,000,000 playing at FanDuel.[25]

---

[20] http://www.legalsportsreport.com/4548/draftkings-data-leak-faq/ (last visited Nov. 6, 2015).
[21] http://thinkprogress.org/sports/2015/10/05/3709392/major-scandal-rocks-fanduel-and-draftkings/ (last visited Nov. 9, 2015).
[22] https://rotogrinders.com/threads/my-name-is-nigel-eccles-ceo-of-fanduel-ask-me-anything-381899?page=3 (last visited Nov. 6, 2015).
[23] http://www.nytimes.com/2015/10/12/sports/fantasy-sports-draftkings-fanduel-insiders-edgefootball.html (last visited Nov. 6, 2015).
[24] http://www.nytimes.com/2015/10/12/sports/fantasysports-draftkings-fanduel-insiders-edge-football.html (last visited Nov. 6, 2015).
[25] http://www.businessinsider.com/draftkings-daily-fantasy-sports-fanduel-2015-10 (last visited Nov. 6, 2015).

**E.**      **Defendants' Management Encouraged Cross-Company Play**

66.      Until news of this scandal broke, DraftKings and FanDuel had no policy against personnel playing on other DFS sites.  In fact, Defendants knew their employees were doing so.

67.      Both sites actively recruited dedicated DFS enthusiasts to work for the company and allowed them to play competitors' games.

68.      DraftKings' founder Paul Liberman is reported to have stated at a conference at Babson College that barring employees from playing games would make it difficult to retain talented employees because these employees made so much more money playing DFS than working for the companies: "We have some people who make significantly more money off of our competitors' sites than they do working for DraftKings."[26]

69.      Defendants' policies allowed the companies to retain employees at low wages by permitting them to use other DFS websites while privy to inside information that gave them an unfair competitive advantage.

70.      DraftKings CEO Robins even admitted to having insider information. When a consumer asked Robins for certain statistics, he replied "[w]e can set up the rules however we want" and told the user "I prefer not to share the real numbers publicly." The reason Robins stated was that "I really don't think site owners should be sharing stats on winning vs. nonwinning strategies. Part of what makes this a skill game is that people who are skilled can figure out for themselves how to win consistently."[27]

---

[26] http://www.nytimes.com/2015/10/12/sports/fantasy-sports-draftkings-fanduel-insiders-edgefootball.html (last visited Nov. 6, 2015).
[27] https://rotogrinders.com/threads/dk-stacking-tonight-8230-129959?page=5 (last visited Nov. 6, 2015).

71.     DraftKings policies were changed only after the public learned that insiders at Defendants' companies were winning inordinate amounts of money on competitor sites.

72.     In early October 2015, Defendants' scam broke national news.  Within days, Defendants each issued public statements on the matter. On October 7, 2015, FanDuel stated "We have permanently banned our employees from playing any daily fantasy games for money, on any site. We will also require all customers to confirm that they are not an employee of any other third party fantasy site, and if they are, they will not be allowed to access our site."[28]

73.     On the same day DraftKings stated that its "employees will permanently be prohibited from participation in any public daily fantasy games for money."[29]

74.     On October 15, 2015, the FBI announced a criminal investigation of Defendants arising from the misconduct alleged herein.

75.     Relatedly, a federal grand jury has issued a subpoena to the trade group that oversees DFS as part of an investigation into the practices and legality of DFS websites.

76.     The New York State Attorney General has also opened an inquiry into the prospect that employees of both companies won lucrative payouts based on information unavailable to the public

## INVALIDITY OF ARBITRATION PROVISIONS OF TERMS OF USE

77.     Defendants' websites' Terms of Use are not a valid, enforceable contracts.

78.     Plaintiffs and the Class were fraudulently induced into placing money onto Defendants' websites because Defendants' DFS competitions were supposed to be fair games of skill without the potential for insiders to use non-public information to compete against them.

---

[28] https://newsroom.fanduel.com/2015/10/07/statement-to-the-press (last visited Nov. 6, 2015).
[29] http://playbook.draftkings.com/press/draftkings-statement-1072015/ (last visited Nov. 6, 2015).

79.     The so-called "Terms of Use" do not constitute a valid, mutual agreement because the promises made by Defendants are illusory. Indeed, under the respective Terms of Use, there is no restriction on Defendants' ability to terminate the "agreement" or to refuse to perform. For example, the so-called "Terms of Use" of DraftKings provide that DraftKings and related individuals such as officers and directors are released from any liability for any claim by the user "whatsoever":

> "By entering into a Contest or accepting any prize, entrants, including but not limited to the winner(s), agree to indemnify, release and to hold harmless DraftKings, its parents, subsidiaries, affiliates and agents, as well as the officers, directors, employees, shareholders and representatives of any of the foregoing entities (collectively, the "Released Parties"), from any and all liability, claims or actions of any kind whatsoever, including but not limited to … [examples of various types of liability listed]"[30]

80.     Another reason why DraftKings' so-called "Terms of Use" constitute an illusory contract is that they purport to reserve to Defendant the right to deny service to any user for any reason "whatsoever": "DraftKings reserves the right, in its sole and absolute discretion, to deny any contestant the ability to participate in head-to-head contests for any reason whatsoever." Thus, DraftKings is not bound to any performance obligation.

81.     Yet another reason why DraftKings' so-called "Terms of Use" is an illusory contract is that it purports to give DraftKings the right, "without prior notice," to "revoke any or all of your rights granted hereunder." Thus, once again, DraftKings is not bound to any performance obligation.

82.     The Terms of Use for both Defendants purport to require arbitration, but gives Defendants the exclusive right to revoke the arbitration provision.  DraftKings' Terms of Use

---

[30] https://www.draftkings.com/help/terms (last visited Nov. 6, 2015).  FanDuel's Terms of Use contain similar language.  *See* https://www.fanduel.com/terms (last visited Nov. 6, 2015).

provide that "Any claim or dispute between you and DraftKings that arises in whole or in part from the Terms of Use, the Website or any Contest shall be decided exclusively by a court of competent jurisdiction located in Suffolk County, Massachusetts," while FanDuel's Terms of Use give FanDuel the right to change its arbitration provisions with sixty (60) days' notice and also state that "For any dispute not subject to arbitration you and FanDuel agree to submit to the personal and exclusive jurisdiction of and venue in the federal and state courts located in New York, NY."

83.     In addition, a user only has to check a box saying he or she has read the Terms of Use to sign up for the website, and the deposit of money and entry into contests is done through separate transactions.

84.     The Terms of Use of both Defendants' websites are procedurally and substantively unconscionable, invalid, and should not be binding upon Plaintiffs and members of the Class.

## CLASS ACTION ALLEGATIONS

85.     Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this class action on behalf of the following National Classes and/or State Sub-Classes:

### DraftKings National Class

All residents of the United States who deposited money into a DraftKings account before October 6, 2015 and competed in any competition or contest where other entries were made by employee(s) of DraftKings, FanDuel, or any other DFS site.

### FanDuel National Class

All residents of the United States who deposited money into a FanDuel account before October 6, 2015 and competed in any

21

competition or contest where other entries were made by employee(s) of DraftKings, FanDuel, or any other DFS site.

### Pennsylvania DraftKings Sub-Class

All persons in the Commonwealth of Pennsylvania who deposited money into a DraftKings account before October 6, 2015 and competed in any competition or contest where other entries were made by employee(s) of DraftKings, FanDuel, or any other DFS site.

### Pennsylvania FanDuel Sub-Class

All persons in the Commonwealth of Pennsylvania who deposited money into a FanDuel account before October 6, 2015 and competed in any competition or contest where other entries were made by employee(s) of DraftKings, FanDuel, or any other DFS site.

86.    Plaintiffs reserve the right to re-define these Classes prior to class certification.

87.    Excluded from this definition are: any executive, officer, employee, consultant, or agent of a DFS business; Defendants and any entities in which Defendants have a controlling interest, or which have a controlling interest in either of Defendants; any entities in which Defendants' officers, directors, or employees are employed; any of the legal representatives, heirs, successors, or assigns of Defendants; the Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case; and any of Defendants' outside counsel and their immediate family.

88.    A class action is the proper form to bring Plaintiffs' claims under the applicable law. The potential Classes are so large that joinder of all members would be impracticable. Additionally, there are questions of law or fact common to the Classes, the claims or defenses of the representative parties are typical of the claims or defenses of the Classes, and the representative parties will fairly and adequately protect the interests of the Classes.

89.   <u>Numerosity</u>: The number of persons who are members of the Classes (or Sub-Classes), as described above, is so numerous that joinder of all members in one action is impracticable. While the exact number is not known at this time, it is generally ascertainable by appropriate discovery. News accounts discuss how millions of users compete on the websites of Defendants.

90.   <u>Commonality and Predominance</u>: Questions of law and fact that are common to the entire Classes (or Sub-Classes) predominate over individual questions because the actions of Defendants complained of herein were generally applicable to the entire Classes (or Sub-Classes).  These legal and factual questions include, but are not limited to:

(a)   Whether Defendants made the representations set forth herein and substantially similar representations to Plaintiffs and members of the Classes;

(b)   Whether Defendants' advertisements were false, misleading, or unfair;

(c)   Whether Defendants owed duties to Plaintiffs and members of the Classes, the scope of those duties and if they breached those duties;

(d)   Whether Defendants fraudulently induced Plaintiffs and members of the Classes into using their website under false pretenses, through material misrepresentations or material omissions;

(e)   Whether consumers were harmed by Defendants' fraudulent actions or omissions as described herein;

(f)   Whether the Defendants' Terms of Use are unconscionable, illusory, fraudulent, or otherwise invalid;

(g)     Whether Defendants' employees used non-public data and/or information to gain an advantage at DFS sites, whether Defendants acted in concert to condone, allow, or promote this practice, or whether Defendants were negligent in allowing employees to access and use confidential data, or were negligent or committed fraud in failing to disclose to Plaintiffs and members of the Classes that these practices were occurring;

(h)     Whether Defendants engaged in deceptive and/or misleading activity with the intent to defraud Plaintiffs and members of the Classes;

(i)     Whether Defendants are liable to Plaintiffs and members of the Classes for damages for conduct actionable under state consumer protection statutes;

(j)     Whether Defendants unjustly enriched themselves by its acts and omissions, at the expense of Plaintiffs and members of the Classes; and

(k)     The extent of the damages caused by Defendants' acts.

The common questions of law and fact identified above are common to the Classes (or Sub-Classes) and predominate over questions affecting only individual members. A determination of Defendants' knowledge regarding the conduct alleged herein will be applicable to all members of the Classes (or Sub-Classes).  Further, whether Defendants violated any applicable state laws and pursued the course of conduct complained of herein, whether Defendants acted intentionally, recklessly, or negligently in engaging in the conduct described herein, and the extent of the appropriate measure of injunctive and declaratory relief, damages, and restitutionary relief are common questions to the Classes (or Sub-Classes).

91.    <u>Typicality</u>:  Plaintiffs' claims are typical of those brought on behalf of the members of the Classes (or Sub-Classes). Plaintiffs, like all Class members, paid money for a

competition that was advertised as being one of skill. Plaintiffs, like all Class members, paid at least one entry fee to pay for a game that he reasonably expected he could use his knowledge and skill of professional sports to have a fair chance of winning.  Plaintiffs, like all Class members, paid to play a DFS competition that was rigged and in which employees of Defendants had an unfair advantage.

92.    <u>Adequacy of Representation</u>: Plaintiffs will fully and adequately represent and protect the interests of the Classes (or Sub-Classes) because of the common injuries and interests of the members of the Classes (or Sub-Classes) and the singular conduct of Defendants that is or was applicable to all members of the Classes (or Sub-Classes).  Plaintiffs have retained counsel who are competent and experienced in the prosecution of class action and consumer litigation. Plaintiffs have no interests that are contrary to or in conflict with those of the Classes (or Sub-Classes) they seek to represent.

93.    <u>Superiority</u>:  A class action is superior to all other available methods for fair and efficient adjudication of this controversy.  Plaintiffs anticipate no difficulty in managing and maintaining this action as a class action. The prosecution of separate actions by individual members of the Classes (or Sub-Classes) would create a risk of inconsistent and varying adjudications concerning the subject of this action, which adjudications could establish incompatible standards of conduct for Defendants under the laws alleged herein. Furthermore, each Class member's damages are relatively small. Prosecution of this litigation is likely to be expensive. For example, Plaintiffs' counsel anticipates that to fully analyze damages, expert analysis alone will cost at least tens of thousands of dollars. Given the high cost of litigation, relatively low individual damages, and the fact that an individual litigating against Defendants would have to hire an expert to perform an analysis regarding damages that would be similar to

the analysis required to prove the claims of an entire Class, it would be uneconomical and economically unfeasible for any (or almost any) Class member to pursue this litigation as an individual action.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
**(On Behalf of the National Classes or
Alternatively the Pennsylvania Sub-Classes)**

94.     Plaintiffs re-allege and incorporate by reference paragraphs 1-93 above.

95.     Defendant DraftKings owed duties to Plaintiff Cantamaglia and members of the proposed DraftKings Classes, and Defendant FanDuel owed duties to Plaintiff Oliva and members of the proposed FanDuel Classes, as users and paying customers of those sites, to use reasonable care to provide true, reliable, accurate and secure information and contests. DraftKings and FanDuel also owed Plaintiffs and members of the proposed Classes a duty to not use exclusive insider and non-public information to exploit DFS website competitions for winnings and gain a competitive advantage that Plaintiffs and members of the proposed Classes did not also have.

96.     DraftKings and FanDuel breached its duties to Plaintiffs and the proposed Classes by failing to prevent persons with inside information and data by virtue of their employment at other DFS sites from competing against Plaintiffs and the proposed Classes.

97.     Defendants knew or reasonably should have known that the practices alleged herein were occurring.

98.     In the course of their business, profession, and employment, Defendants and their agents, representatives, and employees supplied false information to or omitted material information from Plaintiffs and the proposed Classes.

99.     Plaintiffs and the proposed Classes justifiably relied upon the information supplied by Defendants, and, as a result, engaged in business with Defendants and unfairly or wrongfully lost money.

100.    Defendants failed to use reasonable care in communicating, and omitted communicating, the information about safety and security of inside data, employee access to inside data, and the ability of its and other DFS websites' employees to use material, non-public data to compete against Plaintiffs and members of the proposed Classes on its and other websites, or allow employees of other companies with material, non-public access to compete on the website where Plaintiffs and members of the proposed Classes competed.

101.    Plaintiffs and members of the proposed Classes were damaged in an amount to be proven at trial as a direct and proximate result of Defendants' negligence.

### COUNT II
### FRAUDULENT MISREPRESENTATION
### AND MISREPRESENATION BY OMISSION
#### (On Behalf of the National Classes or
#### Alternatively the Pennsylvania Sub-Classes)

102.    Plaintiffs re-allege and incorporate by reference paragraphs 1-101 above.

103.    Defendants knowingly made material representations that were false, that Defendants knew were false, or that Defendants were reckless as to the veracity of those representations.

104.    At all relevant times, and as specifically detailed above, Defendants misrepresented that its DFS contests were fair contests of skill where competitors' knowledge

could make the difference between winning and losing when, in fact, the games were not contests of skill.

105.    Defendants were aware that the integrity of its DFS competitions was a material fact in inducing Plaintiffs and the proposed Class to give money in exchange for services and agreeing to the alleged contract.

106.    Defendants willfully failed to disclose that employees, agents, owners and/or others with non-public inside information, data and access to Plaintiffs and the proposed Classes' submissions would use this information to compete against Plaintiffs and obtain an enormous increased chance to win, thereby greatly decreasing Plaintiffs' and Class members' ability to use skill to win.

107.    Additionally, at all relevant times, Defendants failed to disclose to Plaintiffs and the Classes the material fact that Defendants allowed their employees to use material, non-public, valuable data and information to gain an enormous edge over competitors on their co-Defendant's website.

108.    Defendants communicated to customers that their employees were not allowed to play on their own sites, but omitted the material fact that they were allowed to play on other DFS sites and that other sites' employees were allowed to play on their site.

109.    Defendants also failed to disclose the fact that employees with access to confidential, internal data were winning large amounts of money on their own and other DFS sites.

110.    Plaintiffs and members of the Classes deposited money with Defendants prior to the disclosure of these material omissions and misrepresentations.

111.    Plaintiffs and members of the proposed Classes would not have deposited money or engaged in any activity on Defendants' websites if they had known that they were competing against individuals with insider knowledge, access, and use of non-public data.

112.    Defendants made the material representations and omissions alleged herein for the purpose of inducing Plaintiffs and the Classes to act upon them, and Plaintiffs and members of the Classes justifiably relied on these false material misrepresentations and omissions.

113.    Defendants' material misrepresentations and omissions fraudulently induced Plaintiffs and members of the Classes to give Defendants money, which ultimately went to Defendants and their employees.

114.    As a result of Defendants' fraudulent representations and omissions, Plaintiffs and the proposed Classes were induced into contracts that they otherwise would not have made.

115.    As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs and Class members suffered financial injury, harm, and damages.

## COUNT III
### VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 Pa. C.S.A. §§ 201-1, *ET SEQ.* ("UTPCPL")
### (On Behalf of the Pennsylvania Sub-Classes)

116.    Plaintiffs re-allege and incorporate by reference paragraphs 1-115 above.

117.    The conduct alleged above constitutes unfair methods of competition or unfair or deceptive acts or practices in violation of Section 201-2(4)(iii), (v), (vii), (ix), (xiv) and (xxi) of the UTPCPL, 73 Pa. C.S.A. §§ 201-1, *et seq*.

118.    The UTPCPL applies to the claims of Plaintiffs and the Pennsylvania Sub-Classes because the conduct which constitutes violations of the UTPCPL by Defendants occurred in substantial part within the Commonwealth of Pennsylvania.

119.     Plaintiffs and the Pennsylvania Sub-Classes are consumers who paid or deposited money into Defendants' websites for Defendants services and the opportunity to compete in Defendants' DFS competitions.   Defendants' services are primarily for personal, family or household purposes within the meaning of 73 Pa. C.S.A. § 201-9.2.

120.     Defendants used and employed unfair methods of competition and/or unfair or deceptive acts or practices within the meaning of 73 Pa. C.S.A. §§ 201-2 and 201-3.

121.     Defendants' concealments, omissions, deceptions and conduct were likely to deceive and likely to cause misunderstanding and/or in fact caused Plaintiffs and the Pennsylvania Sub-Classes to be deceived.

122.     Defendants intended that Plaintiffs and the Pennsylvania Sub-Classes would rely on their misrepresentations, concealment, warranties, deceptions and/or omissions, including that their DFS competitions were based upon skill and knowledge.

123.     Plaintiffs and the Pennsylvania Sub-Classes have been damaged as a proximate result of Defendants' violations of the UTPCPL and have suffered actual, ascertainable losses.

124.     As a direct and proximate result of Defendants' violations of the UTPCPL as set forth above, Plaintiffs and the Pennsylvania Sub-Classes have suffered an ascertainable loss of money and are therefore entitled to relief, including damages, plus triple damages, costs and attorneys' fees under Section 201-9.2 of the UTPCPL.

125.     To the extent that justifiable reliance is required to be pleaded, Plaintiffs and the Pennsylvania Sub-Classes have justifiably relied on the Defendants' conduct and/or omissions as alleged herein in depositing money on their websites and paying to play in Defendants' DFS competitions.

**COUNT IV**
**CIVIL CONSPIRACY**
**(On Behalf of the National Classes or**
**Alternatively the Pennsylvania Sub-Classes)**

126.    Plaintiffs re-allege and incorporate by reference paragraphs 1-125 above.

127.    As described in detail herein, Defendants engaged in a corrupt or unlawful combination and/or agreement with each other to do an unlawful act, and continued to act in concert after the act was discovered.

128.    Specifically, by affirmatively agreeing to allow competitors' employees to play on their own sites against their own players with inside information and data, and concealing and not disclosing this to Plaintiffs and the proposed Classes, Defendants committed negligence and/or fraud.

129.    These overt acts were done pursuant to or in furtherance of the conspiracy to allow their employees and officers to profit, continue to attract new players to their websites, and otherwise profit because of their unlawful activities.

130.    FanDuel knew that its employees played on DraftKings, and DraftKings knew that its employees played on FanDuel with inside information and non-public data.

131.    Defendants gave each other assistance and encouragement in accomplishing the tortious result of having their employees unfairly compete against and beat players on other DFS sites.

132.    As a direct and proximate result of Defendants' concerted actions, Defendants are both liable to Plaintiffs and the members of the proposed Classes.

## COUNT V
## TORTIOUS INTERFERENCE WITH
## PROSPECTIVE ECONOMIC ADVANTAGE
### (On Behalf of the National Classes or
### Alternatively the Pennsylvania Sub-Classes)

133.    Plaintiffs re-allege and incorporate by reference paragraphs 1-132 above.

134.    Economic relationships existed between Plaintiffs and the Classes, on the one hand, and Defendants, on the other.

135.    Defendant FanDuel tortiously interfered with these contracts and business relationships with DraftKings because it knew that Plaintiff Cantamaglia as a customer of DraftKings expected to play a fair game based on a combination of skill and luck, and not based on superior inside information about selection patterns within the fantasy sports industry.

136.    Defendant DraftKings tortiously interfered with these contracts and business relationships with FanDuel because it knew that Plaintiff Oliva as a customer of FanDuel expected to play a fair game based on a combination of skill and luck, and not based on superior inside information about selection patterns within the fantasy sports industry.

137.    Defendants knowingly allowed their employees to exploit their inside information, and knew that Plaintiffs and the members of the Classes would be deprived of a fair game and the chance of winning cash prizes.

138.    FanDuel, for its own part, permitted this conduct to occur because had it prohibited the conduct it would have had to pay its employees more money as salary or compensation.

139.    DraftKings acted with the knowledge that interference or disruption of Plaintiff Oliva's and Class members' relationships with FanDuel were certain or substantially certain to result from its unlawful conduct.

140.    FanDuel acted with the knowledge that interference or disruption of Plaintiff Cantamaglia's and Class members' relationships with DraftKings were certain or substantially certain to result from its unlawful conduct.

141.    As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the proposed Classes have suffered damages.

**COUNT VI**
**AIDING AND ABETTING**
**(On Behalf of the National Classes or**
**Alternatively the Pennsylvania Sub-Classes)**

142.    Plaintiffs re-allege and incorporate by reference paragraphs 1-141 above.

143.    Defendants knowingly provided substantial assistance to the torts committed by one another described above.

144.    DraftKings knew that FanDuel employees were using inside information to win money on DraftKings, and FanDuel knew that DraftKings employees were using inside information to win money on FanDuel.

145.    Each company allowed this activity to continue in order to keep growing the fantasy sports industry, increase entry fees, and retain their employees.

146.    As a direct and proximate result Defendants' conduct, Plaintiffs and members of the Classes suffered damages.

**COUNT VII**
**BREACH OF CONTRACT**
**(On Behalf of the National Classes or**
**Alternatively the Pennsylvania Sub-Classes)**

147.    Plaintiffs re-allege and incorporate by reference paragraphs 1-146 above.

148.    Plaintiffs and members of the proposed Classes entered into contracts with Defendants by depositing money on their websites in return for the opportunity to participate in

DFS competitions and the promise that Defendants would provide fair DFS competitions awarding "skill."

149.    Defendants breached their contracts with Plaintiffs and the members of the Classes by failing to abide by their obligations under the applicable law and the agreements, specifically by virtue of allowing competitor employees – including namely their co-Defendants - to compete on the their websites with insider data.

150.    Defendants' contracts included an implied covenant of good faith that Defendants would conduct business with Plaintiffs and Class members in good faith and would deal fairly with consumers.

151.    Defendants breached these covenants because the contracts between Plaintiffs and members of the Classes on the one hand and Defendants on the other hand vested Defendants with discretion and control over how their DFS competitions were carried out, and Defendants exercised discretion and control to ensure its DFS competitions could be exploited by insiders, particularly employees of their co-Defendants, to the financial harm of Plaintiffs and members of the Classes.

152.    Further, Defendants breached the implied covenant by not providing in its Terms and Conditions language that conspicuously stated to Plaintiffs and Class members that employees from competitor DFS websites would be permitted to compete in their competitions with a competitive advantage, *i.e.* inside information and data.

153.    Defendants' breach of these implied covenants resulted in a breach of its contracts with the respective Plaintiffs and Class members.

154.    At all times pertinent hereto, Plaintiffs and the members of the Class fully performed and satisfied their obligations under their respective contracts with DraftKings and FanDuel.

155.    As a proximate result of the above-described wrongful conduct and breaches committed by Defendants, Plaintiffs and Class members have suffered and will continue to suffer damages and economic loss in an amount to be proven at trial.   Plaintiffs and Class members are entitled to damages and injunctive and declaratory relief as specified below.

**COUNT VIII**
**UNJUST ENRICHMENT**
**(On Behalf of the National Classes or**
**Alternatively the Pennsylvania Sub-Classes)**

156.    Plaintiffs re-allege and incorporate by reference paragraphs 1-155 above.

157.    Plaintiffs and the members of the Classes conferred a benefit on Defendants by depositing money and playing in contests on their DFS websites.

158.    Defendants have been unjustly enriched in retaining the revenues derived from Plaintiffs' and Class members' deposits and contest entries. Such retention under these circumstances is unjust and inequitable because Defendants misrepresented the facts concerning the fairness of their DFS contests.

159.    Defendants have voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of Defendants' misconduct, Plaintiffs and the Classes were not being given the fair opportunity to participate in and obtain winnings from Defendants' DFS website competitions as was represented by Defendants and that reasonable consumers expected.

160.    Plaintiffs and members of the Classes were injured as a direct and proximate result of Defendants' misrepresentations and omissions because they paid for entry into contests and deposited money onto their websites, which they would not have done had they known the truth about Defendants' websites and Defendants' unfair acts.

161.    As the intended and expected result of its conscious wrongdoing, Defendants have profited and benefited from the entry fees paid by Plaintiffs and members of the Classes.

162.    Defendants have been unjustly enriched by this fraudulent and deceptive withholding of benefits to Plaintiffs and the Classes, at the expense of these parties.

163.    Equity and good conscience militate against permitting Defendants to retain these profits and benefits as this retention of the non-gratuitous benefits conferred on them by Plaintiffs and the members of the Classes is unjust and inequitable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and members of the proposed Classes pray that this case be certified and maintained as a class action, and for judgment to be entered upon Defendants as follows:

a.      For an order certifying the Classes, appointing Plaintiffs and undersigned counsel to represent the Classes, and notice to the Classes to be paid by Defendants;

b.      For actual damages sustained by Plaintiffs and the Classes;

c.      For restitution to Plaintiffs and the Classes of all monies wrongfully obtained by Defendants;

d.      For injunctive relief requiring Defendants to cease and desist from engaging in the unlawful, unfair, and/or deceptive practices alleged in the Complaint;

e.       For an order awarding declaratory relief, retrospective and prospective injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein, and injunctive relief to remedy Defendants' past conduct;

f.       For reasonable attorneys' fees, costs incurred, pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded;

g.       For punitive damages, as otherwise applicable; and

h.       For such other and further relief that this Court deems just and proper under equity or law, including the award of punitive damages.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all claims so triable.

Dated:  November 9, 2015               Respectfully submitted,

By:    _____
**CHIMICLES & TIKELLIS LLP**
Joseph G. Sauder (PA # 82467)
Matthew D. Schelkopf (PA # 89143)
Andrew W. Ferich (PA # 313696)
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633
E-mail: JGS@chimicles.com
         MDS@chimicles.com
         AWF@chimicles.com

**McCUNEWRIGHT, LLP**
Richard D. McCune*
David C. Wright*
Daniel H. Chang*
2068 Orange Tree Lane, Suite 216
Redlands, California  92374
Telephone:  (909) 557-1250
Facsimile:  (909) 557-1275
E-mail:
  rdm@mccunewright.com
  dcw@mccunewright.com
  dhc@mccunewright.com

*Pro Hac Vice Applications to be Submitted*


**THE MALONE FIRM, LLC**
Thomas B. Malone (PA # 77291)
1650 Arch Street, Suite 1903
Philadelphia, PA 19103
Telephone: 215-987-5200
Email:   tmalone@themalonefirm.com


*Counsel for Plaintiffs and the Putative Class*